# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| RENEE PIPKINS ET AL | **CASE NO. 5:15-cv-2722** |
| -vs- | **JUDGE DRELL** |
| JAMES E STEWART SR | **MAGISTRATE JUDGE HORNSBY** |

## MEMORANDUM RULING

Before the Court are the following motions: (1) a motion for summary judgment, (Doc. 132), filed by Defendant James E. Stewart, Sr., in his official capacity as District Attorney of Caddo Parish, First Judicial District of Louisiana ("District Attorney")[1]; (2) a "Motion to Strike Inadmissible Evidence" also filed by the District Attorney, (Doc. 147); (3) the District Attorney's <u>Daubert</u> motion excluding new expert evidence included in Plaintiffs' opposition, (Doc. 148); and (4) Plaintiffs' motion to strike exhibits submitted by the District Attorney in his reply to Plaintiffs' opposition, (Doc. 152). All motions and responses have been filed and briefed, and the matters are ready for disposition. For the reasons below, (1) Plaintiffs' motion to strike, (Doc. 152), will be **DENIED**; (2) the District Attorney's motion to strike, (Doc. 147), and (3) <u>Daubert</u> motion, (Doc. 148), will be **GRANTED**; and (4) the District Attorney's motion for summary judgment, (Doc. 132), will be **GRANTED.**

---

[1] The First Judicial District of Louisiana and Caddo Parish are coterminous jurisdictions. As such, the descriptions will be used interchangeably throughout. <u>See</u> Louisiana District Court Judicial Districts, THE LOUISIANA SUPREME COURT, https://www.lasc.org/About/MapsofJudicialDistricts (last visited Aug. 22, 2022). Additionally, Plaintiffs originally filed suit against former District Attorney Dale Cox, in his official capacity. For simplicity's sake, the court will refer to the Office of the District Attorney of Caddo Parish, First Judicial District of Louisiana, whether under the administration of former District Attorney Cox or current District Attorney Stewart, as the "District Attorney."

## I.    BACKGROUND

This suit alleges that the District Attorney systematically exercised and continues to exercise peremptory challenges against African American prospective jurors based on their race. (Doc. 18). Plaintiffs further allege the District Attorney purposely excluded Black venirepersons to empanel predominately White criminal trial juries, in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). (Doc. 18). Despite our earlier ruling in this case, where we held Plaintiffs' evidence to be improper on these facts, Plaintiffs continue to center their case on a statistical analysis conducted by Reprieve Australia ("Reprieve"). <u>See</u> <u>Pipkins v. Stewart</u>, No. 5:15-cv-2722, 2019 WL 1442218 (W.D. La. Apr. 1, 2019). Reprieve is a nonprofit organization said to not be affiliated with Plaintiffs or their counsel. (Doc. 18). Reprieve acquired the records of 332 non-sealed criminal trials from Caddo Parish from January 28, 2003 through December 5, 2012, pursuant to the Louisiana Public Records Act. (Doc. 18). Among other findings, the Reprieve Study concluded that when a defendant was White, the District Attorney was 2.6 times more likely to strike African American prospective jurors than non-African American prospective jurors, and when an African American defendant stood trial, the District Attorney was 5.7 times more likely to strike African American prospective jurors than non-African American prospective jurors.[2]

Leaning on the Reprieve Study, Plaintiffs filed suit November 19, 2015, and amended their complaints three times. (Docs. 1, 6, 16, 18). The sum of those complaints ("Complaint") sought the following: (1) class certification of all Black citizens of Caddo Parish eligible to serve as jurors in criminal trials; (2) declaratory relief that (a) the District Attorney systematically exercised and continues to exercise racially discriminatory peremptory challenges and that (b) several provisions

---

[2] We mention the Reprieve Study here only for context. We have previously rejected its usefulness. <u>Pipkins v. Stewart</u>, No. 5:15-cv-2722, 2019 WL 1442218, at *16 (W.D. La. Apr. 1, 2019).

of Louisiana law providing for the use of peremptory challenges are unconstitutional; (3) injunctive relief to enjoin the District Attorney from using peremptory challenges against Black prospective jurors; and (4) damages pursuant to 42 U.S.C. § 1983 ("Section 1983") for certain Black plaintiffs who were actually dismissed from the venire through allegedly racially discriminatory jury selection practices. (Doc. 18).

The District Attorney filed a motion to dismiss earlier in the case, (Doc. 20), which we granted in part, dismissing Plaintiffs' request for class certification and their claims for declaratory and injunctive relief. Pipkins, 2019 WL 1442218, at *16. We found that those forms of relief sought were an intrusive and unworkable supervision of the State under O'Shea v. Littleton, 414 U.S. 488 (1974). See Pipkins, 2019 WL 1442218, at *8-11. However, we also observed that the Section 1983 Plaintiffs had standing under Powers v. Ohio, 499 U.S. 400, 414 (1991), for the purposes of seeking damages: "We [the Supreme Court] have held that individual jurors subjected to racial exclusion have the legal right to bring suit on their own behalf." (citing Carter v. Jury Comm'n of Greene Cnty., 396 U.S. 320, 330 (1970)). In so finding, we clearly cautioned:

> To prevail on the merits or for that matter to survive a motion for summary judgment, is a significantly higher bar [than that of a motion to dismiss]. Evidence specific to [the remaining Section 1983 Plaintiffs] showing that the District Attorney exercised peremptory challenges against each of them because of their race will be needed. Statistics appearing to show general trends will not suffice.

Pipkins, 2019 WL 1442218, at *16.

The result of our ruling was the elimination of all claims, except those of four plaintiffs who claimed they qualified to sue, since they were actually excused as prospective jurors by certain assistant district attorneys in Caddo Parish criminal cases. Thereafter, among the four Section 1983 Plaintiffs seeking damages, Kimberly Horton's claims were dismissed for failure to prosecute. (Doc. 126). Three Section 1983 Plaintiffs remain: Darryl Carter, Diane Johnson, and Theresa

Hawthorne (collectively "Plaintiffs"). In the instant motion for summary judgment, the District Attorney asserts that the Plaintiffs cannot establish the existence of a policy or custom, or inadequacy of training, to prevent exercising challenges against prospective jurors based on their race in violation of <u>Monell v. Dep't of Social Services.</u>, 436 U.S. 658 (1978). (Doc. 132).

## II.    MOTIONS IN LIMINE

Before proceeding to the merits of the District Attorney's motion for summary judgment, (Doc. 132), we must first address (1) the District Attorney's objections to Plaintiffs' summary judgment evidence and his motion to strike that evidence as inadmissible, (Doc. 147); (2) his motion to exclude certain "expert" report offerings from Plaintiffs, (Doc. 148); and (3) Plaintiffs' motion to strike "new" evidence in the District Attorney's reply to Plaintiffs' opposition, (Doc. 152).

Structurally speaking, in their opposition, Plaintiffs have submitted several items hoping to bolster their initial failed attempt to obtain injunctive and other relief in a global sense. In other words, despite being told clearly in our previous ruling that the only things left for them were the claims of the three remaining individual prospective jurors, Plaintiffs have persisted in trying to supplement and buttress issues no longer before the court. To do so, they have submitted three large binders of materials purporting to be their opposition to summary judgment. In support of Plaintiffs' claims for damages, they immediately returned to "records of 395 criminal trials from January 2003 through July 17, 2015" as showing a "pervasive, extended practice of the excision of Black prospective jurors . . . ." (Doc. 143). The District Attorney objects to much of the material Plaintiffs submitted in his blocking motions. (Docs. 147-148).

Before going further in the analysis, we must note the Fifth Circuit's recent approbation in <u>Marzett v. Tigner</u>, No. 20-30154, 2022 WL 1551895 (5th Cir. May 17, 2022), wherein the court

states, "It is well settled in our circuit that a claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." Id. at *4 (internal citation and quotation marks omitted). The court remarks that "[o]ur precedent precludes a plaintiff from advancing a new claim or reframing a previously presented one in response to a motion for summary judgment." Id. The District Attorney did not raise this point. Rather, he has chosen motions to strike and to exclude, but for other briefed reasons. Yet, we cannot help observing that the submission of Plaintiffs' opposition, (Doc. 143), is a reframing of issues already determined in our previous ruling.

We decline to regurgitate each of the District Attorney's arguments in the two blocking motions. The briefs in support are generally well-written, documented, and have merit. The two motions—the motion to strike, (Doc. 147), and the motion to exclude, (Doc. 148)—therefore will be **GRANTED**. Our determination, however, does not end here.

Should we be wrong about the granting of the District Attorney's motion to strike, (Doc. 147), and his Daubert motion, (Doc. 148), we will analyze Plaintiffs' countermotion, (Doc. 152), which seeks to block submissions by the District Attorney in his reply to the opposition. As such, we must address Plaintiffs' motion to strike alleged new evidence, (Doc. 152), and the associated arguments in the District Attorney's reply. More specifically, these are: (1) a response to Plaintiffs' "Statement of Uncontested Material Facts," (Doc. 146-1); (2) the affidavit of Laura Fulco, (Doc. 146-2); and (3) a disciplinary committee report regarding defense attorney J. Antonio Florence, a declarant for Plaintiffs. Of note, Plaintiffs' motion to strike specifically disclaims a prayer for surreply. (Doc. 146-3).

The District Attorney argues that Plaintiffs' motion to strike, (Doc. 152), is untimely because it was filed more than 21 days after the District Attorney's reply. FED. R. CIV. P. 12(f)(2).

5

Because the District Attorney's reply, (Doc. 146), was filed February 7, 2022, and Plaintiffs'

motion to strike, (Doc. 152), was filed March 29, 2022, the District Attorney is correct in this

regard, and the Plaintiffs' motion to strike, (Doc. 152), is **DENIED** as untimely with one caveat.

As we see it, despite its tardiness, we still have obligations of propriety when considering new

evidence and arguments submitted in a reply brief. See, e.g., RedHawk Holdings Corp. v.

Schreiber Tr. of Schreiber Living Tr. – DTD 2/8/95, 836 F. App'x 232, 235 (5th Cir. 2020)

(internal citations omitted) ("[A] district court abuses its discretion when it denies a party the

opportunity to file a surreply in response to a reply brief that raised new arguments and then relies

solely on those new arguments in its decision."). Accordingly, we consider whether the alleged

new evidence and arguments presented in the District Attorney's reply are in fact "new," bearing

in mind that the District Attorney's rebuttal evidence that is responsive to new evidence and

arguments first raised in Plaintiffs' opposition is appropriate. See, e.g., United States v. Ramirez,

557 F.3d 200, 203 (5th Cir. 2009) (internal citations omitted) ("This court does not entertain

arguments raised for the first time in a reply brief. However, this court views the situation

differently when a new issue is raised in the appellee's brief, and the appellant responds in his

reply brief."). That is the situation here. We will now address each of the exhibits raised by

Plaintiffs' motion to strike.

### A. Defendant's Response to Plaintiffs' "Statement of Uncontested Material Facts"

The District Attorney appropriately filed a first statement of uncontested facts with his

motion for summary judgment, (Doc. 132-2), to which Plaintiffs responded with their own

statement. (Doc. 143-1). In his reply, the District Attorney included a response to Plaintiffs'

"Statement of Uncontested Material Facts." (Doc. 146-1). There is no provision in either the

Federal Rules of Civil Procedure or this court's Local Rules allowing additional statements or

6

responses to a nonmovant's statements of uncontested facts without leave of court. Accordingly, we decline to consider parts of the District Attorney's response to Plaintiffs' statement of uncontested facts. (Doc. 146-1). We do, however, consider those portions of the response that constitute a reply to Plaintiffs' opposition to the motion for summary judgment. (Doc. 143).

**B.  Affidavit of Laura Fulco**

Laura Fulco's affidavit, (Doc. 146-2), can be viewed in two parts. First, the affidavit analyzes Batson challenges made in Caddo Parish criminal jury trials over a twelve-year span. Second, it summarizes the criminal cases tried by Plaintiffs' declarant, J. Antonio Florence, and any Batson challenges raised therein.

1.  *Batson Challenges in Caddo Parish Criminal Jury Trials (2003-2015)*

The first part of Fulco's affidavit details the number of Batson challenges actually raised in Caddo Parish criminal jury trials between 2003 and 2015 and the outcomes of those challenges. (Doc. 146-2). As we observed in our 2019 ruling, the original complaint sought to rely on the Reprieve Study to prove the elements of a Monell claim. See Pipkins, 2019 WL 1442218, at *8-11. However, and as we have already discussed, this court has previously admonished that the Reprieve Study is inefficient to prove a Monell claim, and that "evidence specific to [Plaintiffs] showing that the District Attorney's peremptory challenges against each of [the Plaintiffs] because of their race will be needed." Pipkins, 2019 WL 1442218 at *16. Further, the District Attorney's motion for summary judgment posits that Plaintiffs are unable to prove the existence of a policy or custom, or inadequacy of training, that illustrates the exercise of racially discriminatory peremptory challenges. Plaintiffs' opposition argues, among other things, that not only does a policy or custom exist, but the District Attorney had both actual and constructive knowledge of the policy or custom. This knowledge argument is new and goes beyond the instant motion, which

7

is limited to only the existence of a policy or custom. Thus, we find that the District Attorney is appropriately allowed, in reply, to offer evidence and argument to rebut Plaintiffs' continuing claim that the District Attorney had actual or constructive knowledge of a policy or custom. The first part of Fulco's affidavit clearly addresses the knowledge issue. (Compare Doc. 146-2 with Doc. 146). Accordingly, we may and will consider this exhibit.

2. *J. Antonio Florence's Caddo Parish Criminal Cases and Batson Challenges*

The second part of Fulco's affidavit summarizes the number of cases tried by J. Antonio Florence, who submitted a declaration in support of Plaintiffs' allegations, (Doc. 143-7). Florence, who primarily works as a criminal defense attorney, points to several Batson challenges he raised as having a persuasive effect here. (Doc. 146). Plaintiffs' Opposition seeks to rely on Florence's declaration to prove the existence of a policy or custom in Caddo Parish jury challenges. (Docs. 143, 143-5). However, we note this declaration was apparently created and signed after the motion for summary judgment was filed; therefore, its content was not previously presented during discovery.[3] Thus, the District Attorney's only opportunity to rebut Florence's declaration and Plaintiffs' reliance thereon was in his reply. Accordingly, we also find it appropriate to consider the second part of Fulco's affidavit, in addressing the first-time claims made by Florence.

**C. Disciplinary Committee Hearing Report Regarding J. Antonio Florence**

The District Attorney's reply also includes a disciplinary committee hearing report on Florence, issued by the Louisiana Attorney Disciplinary Board. (Doc. 146-3). The same reasoning discussed above regarding the timing of Florence's declaration applies with equal force here. Thus, the District Attorney's only opportunity to rebut, or in this instance to discredit, Florence's

---

[3] Plaintiffs filed Florence's Declaration, (Doc. 143-7), on December 20, 2021, nearly two months after the District Attorney filed the instant motion, (Doc. 132), on October 22, 2021.

declaration was in his reply. We therefore accept the disciplinary report as a valid submission and will consider this in our determination.

## III.    APPLICABLE LAW

### A. <u>Law Governing Summary Judgment</u>

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is genuine if evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). We consider "all evidence in the light most favorable to the party resisting the motion." <u>Seacor Holdings, Inc. v. Commonwealth Ins. Co.</u>, 635 F.3d 680 (5th Cir. 2011) (internal citations omitted). It is important to note that the standard for summary judgment is twofold: (1) there is no genuine dispute as to any material fact, and (2) the movant is entitled to judgment as a matter of law. <u>Id.</u>

The movant has the burden of pointing to evidence proving there is no genuine dispute as to any material fact, or the absence of evidence supporting the nonmoving party's case. <u>Liberty Lobby</u>, 477 U.S. at 250. The burden shifts to the nonmoving party to come forward with evidence which demonstrates the essential elements of his claim. <u>Id.</u> The nonmoving party must establish the existence of a genuine dispute of material fact for trial by showing the evidence, when viewed in the light most favorable to her, is sufficient to enable a reasonable jury to render a verdict in her favor. <u>Duffy v. Leading Edge Prods., Inc.</u>, 44 F.3d 308, 312 (5th Cir. 1995) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 321 (1986)). A party whose claims are challenged by a motion for summary judgment may not rest on the allegations in the complaint and must articulate specific factual allegations which meet his burden of proof. <u>Id.</u> "Conclusory allegations unsupported by

concrete and particular facts will not prevent an award of summary judgment." Duffy, 44 F.2d at 312 (citing Liberty Lobby, 477 U.S. at 247).

### B. Law Governing Municipal Liability

A municipality[4] is not liable under Section 1983 on a theory of *respondeat superior*. Monell, 436 U.S. at 694. Nonetheless, a municipality may be liable for acts directly attributed "through some official action or imprimatur." Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001). To establish municipal liability under Section 1983, "[a] plaintiff must identify: (1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." Valle v. City of Houston, 613 F.3d 536, 541-42 (5th Cir. 2010) (quoting Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002) (internal quotation marks omitted) (citing Piotrowski, 237 F.3d at 578)).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983." Connick v. Thompson, 563 U.S. 51, 61 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id. (citing Okla. City v. Tuttle, 471 U.S. 808, 822-23 (1985) (plurality opinion). "[A] policy of inadequate training is far more nebulous, and a good deal further removed

---

[4] Here, "municipality" refers to the Caddo Parish District Attorney's Office. Louisiana law prohibits suits against a district attorney's office in its own name. Hudson v. City of New Orleans, 174 F.3d 677, 680 (5th Cir. 1999). However, a plaintiff may hold a district attorney's office responsible under a theory of Monell liability if the plaintiff initiates a suit that names the district attorney in his or her official capacity. See Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("A suit against a public official in his [or her] official capacity is not a suit against the official personally," but is "to be treated as a suit against the entity.") This is because bringing Monell claims against district attorneys in their official capacities amounts to "another way of pleading an action against an entity of which an officer is or was an agent." Id. at 166.

from the constitutional violation, than was the policy in <u>Monell</u>." <u>Tuttle</u>, 471 U.S. at 822-23 (internal quotation marks omitted). In either case, be it a formal policy, custom, or inadequate training, parties must sufficiently show all elements of a <u>Monell</u> claim to prove that the municipality is liable for its deprivation of rights. <u>Compare</u> <u>Valle</u>, 613 F.3d at 541-42 (discussing the elements of a <u>Monell</u> claim), <u>with</u> <u>Connick</u>, 563 U.S. at 60-63 (discussing inadequacy of training as a <u>Monell</u> claim and the deliberate indifference standard necessary to establish actual or constructive knowledge).

## IV.   ANALYSIS

To bring the focus back into view, it is worth restating that Plaintiffs assert the District Attorney's Office of Caddo Parish had and continues to have a policy or custom of exercising racially discriminatory peremptory challenges, or alternatively, has failed to train its prosecutors to abstain from exercising racially discriminatory peremptory challenges, and as a result, Plaintiffs suffered a civil rights injury. (Doc. 18). Plaintiffs have *not*, however, proved up their claims to survive the District Attorney's motion for summary judgment for the reasons outlined below.

### A.   **<u>Plaintiffs have not demonstrated the existence of either a formal policy or custom that the Caddo Parish District Attorney's Office has followed or currently follows, that systematically excludes Black venirepersons based on their race.</u>**

There is no evidence offered in this record, other than opinions proffered by Plaintiffs and their declarants, that the District Attorney ever promulgated or disseminated a formal policy requiring or encouraging its prosecutors to execute race-based peremptory challenges. Unable to identify such a formal policy, Plaintiffs attempt to show a custom of racial discrimination by prosecutors exercising peremptory challenges by presenting information mired in vagueness that is allegedly demonstrative of this custom. Still, we find that no such custom has been shown to exist.

1.  *The statistical analysis in the Diamond-Kaiser Report shows only general trends and patterns, not a custom of systematic racial discrimination by the District Attorney and fails to consider nondiscriminatory explanations for the study's results.*

In our prior ruling, we cast doubt on the ability of the Reprieve Study to prove the elements of a <u>Monell</u> claim. <u>Pipkins</u>, 2019 WL 1442218, at *16. In response to and with the assistance of two "experts" Drs. Shari Seidman Diamond and Joshua Kaiser, Plaintiffs now attempt to rehabilitate the otherwise inapplicable Reprieve Study, which encompassed data from only January 28, 2003 through December 5, 2012, to include jury selection data through July 17, 2015. (Doc. 143-2). In our view, the experts' study ("Diamond-Kaiser Report") attempts to shoehorn the period in which Plaintiffs were prospective jurors. This derivative analysis produces, supposedly, results much like those produced in the initial Reprieve Study.

The Supreme Court has advised that "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." <u>Int'l Bd. of Teamsters v. United States</u>, 431 U.S. 324, 340 (1977). And, the District Attorney "may rebut the [P]laintiffs' *prima facie* case [of racially discriminating against prospective jurors] by introducing proof that [P]laintiffs' statistics are 'inaccurate or insignificant' or by providing a 'nondiscriminatory explanation for the apparently discriminatory result.'" <u>Anderson v. Douglas & Lomason Co.</u>, 26 F.3d 1277, 1285 (5th Cir. 1994) (citing <u>Teamsters</u>, 431 U.S. at 340). Moreover, even if we take the Diamond-Kaiser Report at face value, it does not show intentional or purposeful discrimination at the behest of the District Attorney; it is only illustrative of a disparity. Disparity alone, frankly, does not prove discrimination. <u>See</u>, <u>e.g.</u>, <u>Milliken v. Bradley</u>, 433 U.S. 267, 280 n.14 (1977) (noting that the Supreme Court "has consistently held that the Constitution is not violated by racial imbalance . . . without more."). While discriminatory impact acts as a relevant source of evidence of

discriminatory purpose, "it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." Washington v. Davis, 426 U.S. 229, 242 (1976). The Diamond-Kaiser Report takes a showing of racial disparities in peremptory challenges and extrapolates this observation to mean that the central, if not the only cause for such outcomes lies in the District Attorney's endorsement of or acquiescence to a custom of systematically excluding Black prospective jurors based on their race. Yet, what the Diamond-Kaiser Report fails to consider are nondiscriminatory reasons for exercising peremptory challenges against these jurors.

While the court appreciates the disparities among jurors based on race highlighted in the conclusions of the Diamond-Kaiser Report, (Doc.143-2), we take issue with the experts' methodology employed to reach these conclusions. Generalizations regarding racial attitudes and discriminatory practices cannot be inferred based on the data provided. And, assuming arguendo that they can be, we cannot impute temporally-distant and factually-dissimilar instances of discrimination onto the claims in the instant litigation or apply this metric in future cases. Numbers only tell part of the story. Nuances and insights to other reasons for the disparity highlighted in the Diamond-Kaiser Report lurk in the part of the narrative not explored. Namely, Plaintiffs did not furnish Drs. Diamond and Kaiser with key information that would better elucidate for the court suggestions or tendencies towards race-based discrimination: voir dire transcripts, prosecutors' notes, and other qualitative, contemporaneous information.[5]

---

[5] Tension occupies the space between the law and statistics. The law primarily deals with deciding the particular dispute in the case and does not concern itself with whether a general method will apply to a family of cases. For that reason, this court excluded evidence previously submitted by Plaintiffs known as the "Reprieve Study," (Doc. 1), which undertook similar methodologies to show a pattern of systematic discrimination against prospective Black jurors. We reiterate that in our 2019 ruling, we admonished that "[s]tatistics appearing to show general trends will not suffice." Pipkins, 2019 WL 1442218, at *16. In fact, it is rare that two cases are viewed as being identical at law; cases can usually be distinguishable factually. The factual details of any given racial discrimination dispute, including any statistics proffered as evidence of such discrimination,

To that end, the District Attorney correctly argues that the Diamond-Kaiser Report, like its predecessor, the Reprieve Study, is flawed because it fails to examine juror questionnaires and voir dire transcripts for nondiscriminatory explanations for supposedly discriminatory results.[6] For example, when prosecutors are seeking the death penalty, peremptory challenges are legitimate and nondiscriminatory if levied against each juror who strongly favors a life sentence over the death penalty, even if the result of such peremptory challenges disproportionately removes the prospective jurors of one race. See State v. Dorsey, 2010-KA-021674, pp. 13-24 (La. 9/7/11); 74 So. 3d 603, 617-22. Additionally, neither study can speak to the *mens rea* of the prosecutors exercising peremptory challenges against Plaintiffs. In fact, neither even attempt to do so.

> 2. *Declarants' statements and campaign speech made by the current Caddo Parish District Attorney also fail to show a custom endorsed and enforced by the District Attorney to systematically exclude Black venirepersons from criminal jury service.*

In further support of their argument, Plaintiffs offer (1) a declaration from former Caddo Parish prosecutor Benjamin Cormier, (Doc. 143-6); (2) a declaration from defense attorney J. Antonio Florence, (Doc. 143-5); and (3) an open letter authored by the current District Attorney Stewart that was published in a local newspaper when he ran as a candidate for the Caddo Parish's top prosecutorial post, (Doc. 143-8). For the following reasons, we find that neither the

---

will be unique to the dispute in question at a given point in time. Thus, underlying statistical assumptions may not be met. See Joseph L. Gastwirth, *Statistical Reasoning in the Legal Setting*, 46 AM. STATISTICIAN 55 (1992). In theory, all jury selection processes should functionally resemble one another. However, the questions raised to prospective jurors, the responses of those prospective jurors, whether prosecutors elect to use peremptory challenges, whether Batson challenges occur, or whether prosecuting and defense counsel consent to a challenge for cause are all idiosyncratic to a particular jury selection process.

[6] It is worth noting that in addition to Drs. Diamond and Kaiser holding doctorates in social psychology and sociology, respectively, (Doc. 143-2), they also hold law degrees and presumably would be more than capable of reviewing court documents to draw the kinds of case-specific conclusions requested by this court.

declarations nor the District Attorney's campaign speech proves a custom of pervasive racial discrimination via peremptory challenges by the District Attorney when selecting jurors for criminal trials.

Benjamin Cormier's declaration claims that a former prosecutor for Caddo Parish, who was not the District Attorney, trained him to strike African American jurors. (Doc. 143-6). Federal Rule of Civil Procedure 56(c)(4) mandates that declarations like the one in question "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." However, "any inadmissible hearsay statement contained in an affidavit is not proper summary judgment evidence." Ball v. Book, No. 1:19-CV-01283, 2022 WL 509389, at *5 (W.D. La. Feb. 18, 2022) (citing Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987)). Here, Cormier's declaration contains hearsay in the form of his recounting, via a Facebook comment, what a former prosecutor at the District Attorney's Office told him after allegedly being trained to strike Black prospective jurors: "you just need a race neutral excuse to avoid a Batson Challenge." (Doc. 143-5) (internal quotation marks omitted). This is an out-of-court statement being offered for the truth of the matter asserted therein, and is, therefore, indisputably hearsay evidence. See FED. R. EVID. 801. As Plaintiffs have not provided an exception to the admissibility of this hearsay evidence, it is inadmissible for the purposes of summary judgment evidence. Ball, 2022 WL 509389, at *5. Even if useable, Cormier's declaration *in globo* is devoid of evidence that the alleged misconduct was the result of any policy, procedure, or training from the District Attorney, thereby making it insufficient to infer municipal liability and causation. Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 406-07 (1997) (noting that even where "a plaintiff [who] has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and

causation; the plaintiff will simply have shown that the employee acted culpably."). Further, Cormier was employed by the District Attorney only between December 2007 and May 2009, (Doc. 146), and the trials in which Plaintiffs were released from jury duty took place in 2015. In other words, Cormier's limited experience is temporally so far removed from Plaintiffs' alleged injury that it cannot be probative of even a modicum of racial discrimination by prosecutors exercising peremptory challenges when Plaintiffs were prospective jurors.

Additionally, Florence's declaration claims that during his tenure as a criminal defense attorney who tried cases in Caddo Parish (2008-2015), he witnessed a disproportionate use of peremptory challenges against African Americans by the District Attorney's Office, suggestive of a policy or custom. (Doc. 143-5). He also claims to have witnessed a pattern of biased questioning practices, including additional questions for White prospective jurors to absolve responses indicative of partiality, or otherwise meriting a strike for cause, while refraining from employing the same rehabilitative practices for Black prospective jurors with similar responses. (Doc. 143-5). Finally, he claims to have witnessed the District Attorney's Office use "coded" language among themselves and with judges to describe the racial profile of the venire. (Doc. 143-5).[7] However, Florence never worked for the District Attorney, and therefore nothing presented here shows that he has actual knowledge of the District Attorney's customs or training protocol to infer municipal liability and causation. There is also no explanation or evidence that his perceived "code" actually exists or existed. Further, there are no voir dire transcripts in the record to corroborate Florence's claims. Florence's declaration does reflect that he raised a <u>Batson</u> challenge in the case where

---

[7] Although not dispositive, the District Attorney argues that Florence only tried twelve criminal cases in Caddo Parish from 2008 to 2015, and in those twelve cases, he filed <u>Batson</u> challenges only twice. (Doc. 146-2). The District Attorney also presents that, unlike its prosecutors who are in good standing, a disciplinary recommendation has been issued against Florence by the Louisiana Disciplinary Board but that no final decision has been implemented. (Docs. 146, 146-3).

Plaintiffs Diane Johnson and Darryl Carter were prospective jurors. (Doc. 143-5). However, the presiding judge considered those challenges and ultimately did not find that Florence made a *prima facie* showing of discrimination. The case was appealed, but the issue of racial discrimination by prosecutors during voir dire was not pursued. See State v. Odums, No. 50,969-KA (La. App. 2 Cir. 11/30/16); 210 So. 3d 850, writ denied, No. 17-0296 (La. 11/13/17); 229 So. 3d 924 (affirming conviction).

Finally, Plaintiffs argue the applicability of the political speech of District Attorney Stewart during his campaign ("Candidate Stewart") for his currently held elective office. Candidate Stewart's comments were published in *The Shreveport Times* after an announcement of the filing of this suit. (Doc. 143-8). In the publication, Candidate Stewart claimed that the filing of the instant suit and the allegations presented were an embarrassment to the citizens of Caddo Parish. (Doc. 143-8). Indeed, Candidate Stewart's comments were critical of former District Attorney Dale Cox, but Candidate Stewart neither stated nor inferred that District Attorney Cox in fact trained prosecutors to exercise racially discriminatory strikes against Black prospective jurors or that District Attorney Cox failed to train prosecutors to abstain from exercising racially discriminatory peremptory challenges. When *The Shreveport Times* published the letter, Candidate Stewart did not work for the District Attorney and therefore could not comment on the actual customs or training of the Office to infer municipal liability and causation. In short, Candidate Stewart's political comments on the existence of the litigation and its allegations to form his political speech are not determinative of anything and are not "smoking guns."

**B. Plaintiffs have not proven that the District Attorney had actual or constructive knowledge of a custom that systematically excluded Black venirepersons from jury service.**

Plaintiffs argue that the Diamond-Kaiser Report demonstrates the existence of an extended and pervasive practice and that "constructive knowledge of a custom or usage exists where the alleged practices are 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct' because 'pervasive practice can be evidence that the official policymaker knew of and acquiesced to the misconduct, making the municipality culpable.'" (Doc. 143) (citing Sanchez v. Young Cnty., Tex., 956 F.3d 785, 793 (5th Cir.), cert. denied, 141 S. Ct. 901 (2020)) (internal citations and quotation marks omitted). This argument goes beyond the holding in Sanchez, wherein the relevant policymaker was put on notice by "numerous" reports issued by a Texas commission describing inadequacies. 956 F.3d at 789, 792-93. There is no evidence in this record of previously documented irregularities by District Attorney Cox nor his successor, District Attorney Stewart, other than the bald claims in this suit and two instances of temporally disparate judicial review. Moreover, the pervasiveness argument, like the Reprieve Study and the Diamond-Kaiser Report upon which it is based, does not eliminate explanations for even arguably discriminatory results.

The District Attorney also replies with a valid suggestion that the actual occurrence of Batson challenges in the Caddo case population better serves to determine the existence of constructive knowledge of an alleged prohibited custom. (Doc. 146). A review of criminal jury trials between 2003 and 2015 reveals that Batson challenges were made in only sixteen of 385 reviewable cases. (Docs. 146, 146-2). Of those sixteen challenges, two were granted at the trial level. (Doc. 146-2). In other words, a Batson challenge was raised in only 4.15% of cases between 2003 and 2015 and only 0.52% were granted at the trial level. (Doc. 146-2). The District Attorney's

18

argument is well taken. See, e.g., Hall v. Robinson, 618 F. App'x 759, 764 (5th Cir. 2015) (finding constructive knowledge of custom of rule violations was not established despite "seventeen reported incidents of [juvenile supervision officer] misconduct . . . filed over a five-year period"). Raising a Batson challenge, which protects a criminal defendant's rights, provides notice of perceived racial discrimination, and a trial court's grant of such a challenge may provide notice of actual racial discrimination. With so few Batson challenges being raised, and even fewer being granted between 2003 and 2015 in Caddo Parish, we do not find that the District Attorney was put on constructive notice of perceived or actual racial discrimination.

Additionally, Plaintiffs claim that six cases predating the trials from which Plaintiffs were excused should have provided the District Attorney with actual knowledge of racial discrimination by prosecutors exercising peremptory challenges. We disagree, because, among other reasons, four of those cases fail to establish a single instance of racial discrimination by prosecutors exercising peremptory challenges, and the remaining two cases predate the trials from which the Plaintiffs were excused by ten and fourteen years. However, to bolster these conclusions and ensure the most fulsome analysis, we now address each trial where counsel filed a Batson challenge and discuss why the outcomes of those challenges (or lack thereof) fail to buttress Plaintiffs' position.

1. *State of Louisiana v. Felton Dorsey*

In 2009, Felton Dorsey was convicted of first degree murder and sentenced to death in Caddo Parish. State v. Dorsey, No. 10-216, pp. 1-2 (La. 9/7/11); 74 So. 3d 603, 610. Relevant here, during voir dire for his trial, Dorsey's attorney filed a timely Batson challenge claiming to have "established a *prima facie* case of discrimination numerically because the State used peremptory challenges to excuse five of seven prospective [B]lack jurors (71%) and only six of twenty-seven prospective [W]hite jurors (22%), thereby striking [B]lack jurors at a rate of more

than three times that of [W]hite jurors." Id. at 616. To rebut the statistical basis for the Batson challenge, the State argued that it released every prospective juror, regardless of race, who indicated a strong preference towards a life sentence over the death penalty. Id. That included four White and four Black prospective jurors, or four of the five Black prospective jurors excused from jury service. Id. at 617 n.5. The trial judge denied the Batson challenge finding "there was no systematic pattern of exclusion based upon race." Id. at 610. After the trial court denied Dorsey's motion for a new trial, he appealed to the Louisiana Supreme Court claiming, among other things, that the trial judge erred in denying his Batson challenge. Id. at 615. The Louisiana Supreme Court reviewed the issue and held that the trial court did not abuse its discretion when it denied the Batson challenge and affirmed Dorsey's conviction. Id. at 610, 617-22.

Despite this outcome, Plaintiffs argue that the statistical evidence of prosecutors exercising peremptory challenges in Dorsey's jury selection process provided the District Attorney with actual knowledge of a custom of racial discrimination by prosecutors exercising peremptory challenges against Black venirepersons. (Doc. 143). We disagree. By finding no abuse of discretion in the district court's denial of the Batson challenge, the Louisiana Supreme Court effectively ruled that the statistical evidence offered by Dorsey was legally insufficient to establish racial discrimination. Dorsey, 74 So. 3d at 610, 617-22. Accordingly, the Dorsey case fails to support Plaintiffs' position.

## 2. *State of Louisiana v. Lamondre Tucker* ("Tucker I")

In 2011, Lamondre Tucker was convicted of first degree murder and sentenced to death in Caddo Parish. State v. Tucker, No. 13-1631, p. 1 (La. 9/1/15); 181 So. 3d 590, 596 ("Tucker I"). Unlike the Dorsey case, Tucker's counsel filed no Batson challenge during jury selection. Tucker I, 181 So. 3d at 625-26. Tucker moved for a new trial, raising, among other claims, a Batson

challenge for the first time. Id. at 625. Tucker claimed to have established a *prima facie* case of discrimination numerically because four of nine prospective Black jurors (44%) were excused, and one of the four was excused without an apparent race-neutral reason. Id. In his motion for a new trial, Tucker provided an analysis of 120 jury cases prosecuted by the District Attorney between 1997 and 2009 demonstrating that the District Attorney exercised peremptory challenges against African Americans at a rate 3.4 times that of all other races ("Tucker Study"). Id. at 614-16; (Doc. 143). The trial court found that a Batson challenge could not be asserted for the first time in the motion for a new trial, and the Louisiana Supreme Court agreed. Tucker I, 181 So. 3d at 625-26.

Plaintiffs argue again that the statistical evidence of prosecutors exercising peremptory challenges in Tucker's jury selection and the Tucker Study provided the District Attorney with actual knowledge of a custom of racial discrimination by prosecutors exercising peremptory challenges against Black venirepersons. (Doc. 143). Again, we disagree. There is no evidence, voir dire transcript, or deposition testimony from which we may conclude that prosecutors excused jurors because of their race during the jury selection process for Tucker's trial. Further, the Tucker Study upon which Plaintiffs rely is not of record here.

### 3. *State of Louisiana v. Lamondre Tucker* ("Tucker II")

Plaintiffs further argue that the District Attorney was again presented with the Tucker Study when Tucker moved to quash the jury during a second trial for conspiracy to commit jury tampering in Tucker I. State v. Tucker, No. 49,950, p. 1 (La. App. 2 Cir. 7/8/15); 17 So. 3d 394 ("Tucker II"); (Docs. 27-29). The reoccurrence of the Tucker Study argument in Tucker II adds nothing substantive to our ruling today, and we continue to disagree with the employment of these statistics to show the District Attorney had actual knowledge of a custom to dismiss venirepersons based on their race.

4. *State of Louisiana v. Robert Coleman*

On February 17, 2005, Robert Coleman was convicted of first degree murder and sentenced to death in Caddo Parish. State v. Coleman, No. 06-0518, pp.1-2 (La. 11/2/07); 970 So. 2d 511, 512. During jury selection, Coleman filed a timely Batson challenge citing that the State used six of its eight peremptory challenges against African American prospective jurors. Id. at 513. The trial court, however, found no *prima facie* showing of discrimination, accepted "race-neutral reasons for the exercise of each of its challenges" from prosecutors, and denied Coleman's Batson challenge. Id. at 514. The Louisiana Supreme Court reversed the conviction based on the State's explanation for excusing one juror—Mason Miller. Id. The State excused Miller because he previously "filed a lawsuit against the city[8] alleging institutional discrimination," which raised concerns because Coleman, the defendant, was Black and the victims were White. Id. at 514. The majority opined that because "the prosecutor's statement explicitly place[d] race at issue" when referencing the race of the defendant and the victims, "the decision to strike [Miller] was not race-neutral, but was based specifically on [his] race, in violation of the fundamental precepts of Batson and its progeny." Id. at 514, 516. We agree with the Louisiana Supreme Court's reasoning here and believe that successful showing of discriminatory practices via race-based peremptory challenges merits this kind of thorough and thoughtful evidentiary support.

Unlike Coleman, here, we are not confronted with an equally thorough analysis of voir dire transcripts, attorneys' jury selection notes, or even extensive treatment of Batson challenges in

---

[8] It is unclear from the opinion whether Miller filed suit against the city where he was employed as captain of the fire department, Bossier City, or if he filed suit against Shreveport, where the venire took place. Presumably since Mr. Miller was called for jury service in Caddo Parish, he resided and/or was registered to vote in Caddo Parish, and the District Attorney may have taken issue with an institutional discrimination suit against the City of Shreveport. Nevertheless, the import of this suit hinges on its nature not the locale of the governmental defendant.

factually analogous cases. Plaintiffs do not rely on the proffered reasons of the State to show that they were dismissed from jury service based on reasons given by the prosecution that "place[d] race at issue." See id. at 514-16. Instead, Plaintiffs wish to rely on inferences from statistical data, not contemporaneous evidence from the jury selection process at the trials in question, to show that the District Attorney systematically excluded Black people from jury service or failed to train his staff to prevent unconstitutional race-based challenges of Black prospective jurors.

To be clear, we are not satisfied that this case alone clearly establishes a *custom* of racial discrimination by Caddo Parish prosecutors exercising peremptory challenges, let alone actual or constructive knowledge of such practices. Additionally, Coleman's trial occurred in 2005, predating the trials from which Plaintiffs were excused by ten years. See e.g., Hall, 618 F. App'x at 764.

5. *Trotter v. Warden La. State Penitentiary*

Edward Trotter was convicted in 2001 of possession of cocaine in Caddo Parish, and his conviction was affirmed on direct appeal. State v. Trotter, No. 37,325 (La. App. 2 Cir. 8/22/03); 852 So. 2d 1247, writ denied, No.03-2764 (La. 2/13/04); 867 So. 2d 689, denying reconsideration, No. 03-2764 (La. 4/23/04); 870 So. 2d 282. Trotter's conviction was eventually vacated through use of *habeas corpus*, based on Batson issues. Trotter v. Warden La. State Penitentiary, 718 F. Supp. 2d 746, 747 (W.D. La. 2010). In Trotter's federal habeas case, this court agreed the state trial court unreasonably determined that the State proffered race-neutral reasons for dismissal of two of three Black venirepersons, despite accepting White venirepersons who gave similar responses to the excused Black venirepersons. Id. at 752-53. We found this to be in violation of the principles announced by the Supreme Court in Miller-El v. Dretke, 545 U.S. 231 (2005). Like Coleman, though, this case predates the trials from which Plaintiffs were excused—this time, by

23

fourteen years. See, e.g., Hall, 618 F. App'x at 764. As a result, we do not find Trotter, even if considered together with Coleman, sufficiently establishes actual or constructive knowledge of a custom of racial discrimination by prosecutors exercising peremptory challenges at the time Plaintiffs were excused from their respective venires.

### 6. *State of Louisiana v. Rodricus Crawford*

Rodricus Crawford was convicted of first degree murder and sentenced to death in Caddo Parish. State v. Crawford, No. 14-2153, p. 1 (La. 11/16/16); 218 So. 3d 13, 15-16. During voir dire, the State exercised seven peremptory challenges, five of which were used to excuse prospective African American jurors. Crawford timely filed a Batson challenge with the court, and the trial court found that a *prima facie* case for racial discrimination was established in accordance with the first step of the Batson framework. Id. at 18, 30-32. However, instead of calling upon the State to provide race-neutral reasons for the exercise of peremptory challenges, the trial court articulated its own race-neutral reasons. Id. Because the trial judge failed to follow the proper Batson challenge inquiry, the Louisiana Supreme Court reversed Crawford's conviction. Id. at 35. Had the trial court properly handled the Batson issue, this case might have some probative value, but the fact is the State was preempted from providing its position on race neutrality. This leaves us completely unable to analyze the situation as it relates to Plaintiffs' claims. Thus, we do not find, on these facts, that the outcome is sufficient to establish a single instance of racial discrimination by prosecutors exercising peremptory challenges, let alone provide the District Attorney with actual or constructive knowledge of a custom of the same. We now turn to the cases involving Plaintiffs.

**C.   Without proof of a custom exercised by the District Attorney to systematically exclude Black prospective jurors or proof of knowledge thereof, there can be no "moving force" that gave rise to the constitutional violations alleged by Plaintiffs.**

Plaintiffs argue that separate proof of causation, *i.e.*, Plaintiffs were excused because of their race, is not required because this is a "straightforward" case. Bryan Cnty., 520 U.S. at 404, 406. However, as we have discussed above, this is *not* a "straightforward" and "obvious" case. Id. Therefore, proof of causation is required. Instead of presenting evidence demonstrating causation, Plaintiffs raise a kind of spoliation claim, not for sanctions, but for an adverse inference to create a genuine issue of material fact regarding causation. (Doc. 143). Plaintiffs' spoliation claims rely on the absence of voir dire transcripts and prosecutors' notes from the trials where Plaintiffs were prospective jurors.

A party raising spoliation must demonstrate that: (1) the spoliating party must have controlled the evidence and been under an obligation to preserve it at the time of destruction; (2) the evidence must have been intentionally destroyed; and (3) the spoliating party acted in bad faith. See Coastal Bridge Co., L.L.C. v. Heatec, Inc., 833 F. App'x 565, 574 (5th Cir. 2020). We decline such an inference because the Plaintiffs provide no law that spoliation arguments, even if proven, can provide this kind of inference. They also fail to demonstrate the elements of a spoliation claim, and the evidence Plaintiffs seek to elicit is strongly refuted by the record.

### 1.   *Plaintiffs Diane Johnson and Darryl Carter*

Plaintiffs Diane Johnson and Darryl Carter were prospective jurors in State v. Surcorey Odums, Docket No. 316,181, First Judicial District of Louisiana, Parish of Caddo (2015). Plaintiffs Johnson and Carter first claim that the absence of voir dire transcripts from the second day of the jury selection process for the Odums trial—when they were examined—helps their cause. (Doc.143). However, according to the affidavit of Sharon Porter, Assistant to the Judicial

Administrator of the First Judicial District Court of Caddo Parish: (1) the District Attorney does not control what is transcribed by the court reporter and lacks authority over court reporters, transcripts, and recordkeeping by the court; (2) the court reporter for <u>Odums</u> is possibly deceased and a transcript otherwise cannot be located; (3) and this information was reported to Plaintiffs by Porter before the instant motion for summary judgment was filed. (Doc. 117-5). There is no reason for this court to infer anything adverse to the District Attorney here since the District Attorney is not blameworthy for any allegedly missing transcripts and because there is no evidence of any tampering or malefaction as to court records from the <u>Odums</u> case.

Plaintiffs next argue that the second chair prosecutor in <u>Odums</u>, Chris Joffrion, failed to produce notes from voir dire for the <u>Odums</u> trial. (Doc. 143). In his deposition, Joffrion testified that he cannot recall what he did with his personal trial notes from <u>Odums</u>, which were notes made six years prior to his deposition. (Doc. 143-27). However, Plaintiffs are apparently unable to argue that Joffrion's voir dire notes (to the extent they ever existed) were intentionally destroyed in bad faith. The District Attorney requests that we ignore any adverse inference that could be taken from Joffrion's missing notes because (1) the trial judge, Judge John D. Mosley, Jr., who is African American,[9] denied a <u>Batson</u> challenge filed in <u>Odums</u>, and (2) the first chair prosecutor, Jason Brown, provided thorough notes and deposition testimony of race-neutral reasons proffered to the court during the <u>Batson</u> challenge.

In the context of <u>Batson</u> challenges, we provide significant deference to trial judges, who are present and attentive during jury selection processes and can holistically assess whether prosecutors are dismissing venirepersons based on their race. <u>Flowers v. Mississippi</u>, 139 S. Ct.

---

[9] Although not dispositive of the issue, the fact that Judge Mosley, who was not deposed in this matter, is African American does suggest a degree of increased awareness with respect to racial discrimination against African Americans within his court.

2228, 2243 (citing Batson, 476 U.S. at 99 n.22; Synder v. Louisiana, 552 U.S. 472, 477 (2008)). Because Odums filed a Batson challenge and the trial court denied it, deference to Judge Mosley's ruling and comity between state and federal courts weigh against any adverse inference. Further, during his deposition, Brown referenced his voir dire notes and relayed four race-neutral reasons for striking Johnson and four race-neutral reasons for striking Carter. (Doc. 141-20). Plaintiffs Johnson and Carter's beliefs as to their dismissal amount to mere speculation and do not generate a genuine dispute of material fact.

2.  *Theresa Hawthorne*

Plaintiff Theresa Hawthorne was a prospective juror in State v. Tommorea Shamichael Carter, Docket No. 316,082, First Judicial District Court, Parish of Caddo (2015) ("Carter"). Plaintiff argues that voir dire notes from both the first chair prosecutor Holly McGinness Pailet and second chair prosecutor Scott Brady were not provided in discovery. (Doc. 143). However, Plaintiff has provided nothing to show that either Pailet or Brady's voir dire notes (to the extent they ever existed) were intentionally destroyed in bad faith. Further, the voir dire transcript from Carter was available, (Docs. 143-34, 143-35), and contains sufficient information to justify the peremptory challenge against Hawthorne. Pailet pointed to voir dire statements of Hawthorne proclaiming that she had been a prospective juror several times but had never been picked for a trial. (Doc. 143-30). Additionally, during the depositions of both prosecutors Pailet and Brady, Plaintiffs' counsel asked about the following voir dire answers from Hawthorne: "He's here for a reason," and "Well, I feel like he's here for a reason. It's got to be something he done did [*sic*] or they got proof that he did it, so it's a reason." (Docs. 143-29, 143-30, 143-31). Both Pailet and Brady explained that Hawthorne's answers suggested presumed guilt, which could have also formed a sound basis for the peremptory challenge. (Docs. 143-30, 143-31). Whether Hawthorne

27

was stricken for having been a prospective juror, but never selected for jury service, or for having made statements suggestive of presumed guilt, either reason would be facially race-neutral. Additionally, Carter did *not* file a <u>Batson</u> challenge in that case. (Doc. 132-20). Given this evidence, we cannot properly infer that Hawthorne was excused because of her race so to generate a genuine issue of material fact.[10]

As in our earlier ruling in this case, we continue to question the practicality of the right of a challenged juror to seek damages due to dismissal for racially discriminatory reasons. That said, the reasons we provide for granting summary judgment here are based largely on the factual analysis of the actual cases where Plaintiffs were prospective jurors. In this court's view, the records of factual evidence in the <u>Odums</u> and <u>Carter</u> cases alone are sufficient to convince us that there is no genuine dispute of material fact in the instant case and that the District Attorney is entitled to judgment as a matter of law.

---

[10]We should also note that Plaintiffs' counsel also represented plaintiffs in a conceptually similar case before the Northern District of Mississippi and appealed that case's dismissal to the Fifth Circuit. In <u>Attala County, Miss. Branch of the NAACP et al. v. Doug Evans</u>, 37 F.4th 1038 (5th Cir. 2022), the Fifth Circuit held that the plaintiffs had no standing to sue due to lack of injury-in-fact. Relevant here, only one of the four individual plaintiffs had been actually dismissed from jury service, but that venireperson's dismissal was upheld by the Mississippi Supreme Court. <u>Id.</u> at 1043 (citing <u>Flowers v. Mississippi</u>, 04-DP-00738-SCT (¶ 12); 947 So. 2d 910, 919-21 (Miss. 2007)). Even still, <u>Attala County</u> differs from the present case in two material aspects. First, it had been well established previously that the Attala County district attorney had been documented time and time again to have engaged in prosecutorial misconduct, including racial discrimination in jury selection and particularly as observed by the U.S. Supreme Court, appearing "to proceed as if <u>Batson</u> had never been decided." <u>Attala Cnty.</u>, 37 F.4th at 1041 (citing <u>Flowers</u>, 139 S. Ct. at 2246. Second, the <u>Attala County</u> plaintiffs included persons who had not been actually excused from jury service but were merely eligible as residents of the jurisdiction over which the district attorney holds prosecutorial power. <u>See id.</u> The fear of their rights being violated, therefore, were only prospective. In the case at bar, however, we do reach the merits of Plaintiffs' remaining claims, because each of them was on a jury panel, and each was actually excused.

## V.   CONCLUSION

This court does not take allegations of racial discrimination lightly, especially when those allegations are made against state actors charged with conducting fair and impartial trials for criminal defendants. Just as important is equal and unfettered access to jury service for all registered voters within a particular jurisdiction. Impediments to such access are prohibited by the Equal Protection Clause of the Fourteenth Amendment. Actual service on the jury, however, may be limited to ensure, again, fair and impartial trials for criminal defendants. But that denial of jury service during the jury selection process cannot occur based on a prospective juror's race or other suspect classifications.

In all this discussion, what becomes clear is that the right the Supreme Court articulated in Powers cannot be characterized by or litigated in generalities. Each claim must be analyzed with reference to the record of a particular venireperson's participation in a particular trial on a particular day. The analysis is fact-intensive. In the case of all three remaining Plaintiffs here, they cannot succeed on that analysis, nor on their general one. As the Supreme Court once opined, "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." Abbott v. Perez, 138 S. Ct. 2302, 2324 (2018) (internal citation and quotation marks omitted). Peremptory challenges against prospective jurors remain a valid method under Louisiana law for dismissing jurors who may not provide a criminal defendant with a fair and impartial trial. Congruently, Batson challenges remain the most effective and systematic method for attacking covert and overt forms of racial discrimination skulking about jury selection. Trial judges are best positioned to determine, on the totality of the circumstances, whether reasons proffered by attorneys are discriminatory remarks masquerading as racially neutral ones.

The motion for summary judgment will therefore be **GRANTED**. A judgment in accordance with this ruling will follow.

THUS, DONE at Alexandria, Louisiana on this _23rd_ day of September 2022.

DEE D. DRELL, SENIOR JUDGE
UNITED STATES DISTRICT COURT

30